## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:14-cr-46 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| JAMES JAMISON, | : | |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER
### REGARDING RESTITUTION

This criminal case came on for sentencing on June 13, 2016. (Min. Entry, 6/23/2016). As anticipated, and as contemplated by the parties' plea agreement (Doc. 120 at ¶¶ 11, 13), the Court determined at sentencing that Defendant owed restitution, in an amount specific, related to the tax fraud scheme (Doc. 156). In determining the appropriate restitution amount, the Court had before it: the Government's motion for restitution and accompanying restitution spreadsheet (Docs. 142 and 154), Defendant's response in opposition (Doc. 149), the Government's sentencing memorandum and accompanying loss spreadsheet (Docs. 147 and 155), Defendant's sentencing memorandum, the parties' oral arguments at sentencing (Min. Entry, 6/23/2016), and the record as a whole.[1] This Opinion and Order memorializes the bases for the Court's findings regarding restitution, as previously articulated at the time of sentencing.

---

[1] The Government's restitution and loss spreadsheets were filed under seal in order to protect taxpayer information. (Docs. 154, 155). The loss spreadsheet includes all (or most) of the fraudulent tax returns filed, as well as a summary of some of the evidence linking the fraudulent returns to Defendant. (Doc. 155). The restitution spreadsheet is identical, except it includes only those returns for which the Government seeks restitution. (Doc. 154).

# I. BACKGROUND

## A. Charged Offenses and Conduct

On May 7, 2014, Defendant was charged in a twenty-nine count indictment with: wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-9); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 10-12); aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 13-17); unauthorized use of access devices, in violation of 18 U.S.C. § 1029(a)(2) and (c)(1)(a)(i) (Counts 18-20); theft of government money, in violation of 18 U.S.C. § 641 (Counts 21-27); and bank fraud, in violation of 18 U.S.C. § 1344 (Counts 28-29). (Doc. 3).

The Indictment alleged that from June 2009 through April 2013, Defendant engaged in a scheme and artifice to defraud the Internal Revenue Service (the "IRS") by obtaining the names and social security numbers of individuals, and filing false tax returns (both electronically and by mail) on behalf of those individuals, without their knowledge or consent. (Doc. 3 at 2-6). Many of the stolen identities belonged to Defendant's own family members, as well as to deceased and incarcerated individuals. (Doc. 155). Defendant would keep the individuals' identification information to re-use later for filing false returns in subsequent tax years. (Doc. 3 at 3). The false tax returns also included fabricated information relating to the taxpayers' addresses, dependents, occupations, income, and education expenses, which fabrications Defendant deliberately selected in an effort to qualify for tax credits that would maximize the refunds issued. (*Id.*)

2

After submitting the false tax returns, Defendant would then call the IRS hotline, debit card support hotlines, and various financial institutions to track their status. (Doc. 3 at 3). Defendant also utilized a mobile banking application on his cellular telephone to track the status of the fraudulent tax refunds he expected to receive. (*Id.*) Defendant directed the refunds issued as a result of the false returns to be deposited into bank accounts that were either in Defendant's name or, alternatively, into accounts that Defendant controlled. (*Id.* at 3, 6). More specifically, the Government alleges that Defendant would fraudulently open bank accounts by using the names and social security numbers of individuals, without their knowledge or permission, and would then impersonate those individuals named on the accounts in order to conduct transactions. (*Id.* at 3-4, 6).

In addition to the fraudulent tax scheme, the Indictment also charged Defendant with theft of Government funds. (*Id.* at 7). The Government alleged that, during the time of the fraudulent scheme, Defendant stole government benefits by submitting applications for food stamps and cash assistance to Hamilton County Job and Family Services, without disclosing the income he received from the false tax scheme. (*Id.*)

Finally, the Indictment also charged Defendant with engaging in a separate check-kiting scheme from October to November 2013. (*Id.* at 8-10). The check-kiting scheme formed the basis for the two counts of bank fraud, *i.e.*, Counts 28 and 29. (*Id.*) The Government asserted that as a result of this scheme, Defendant caused $900 and $2,800 loss to First Financial Bank by cashing two checks drawn on an account at Chase Bank that Defendant knew contained insufficient funds. (*Id.*)

3

### B. Procedural Posture

Defendant was taken into custody on June 3, 2014, at which time an initial appearance was held and counsel appointed. (Doc. 8). At his arraignment on June 5, 2014, Defendant entered pleas of 'not guilty' on all counts. (Doc. 12). Defendant was ordered detained pending trial. (Doc. 13).

After months of plea negotiations, Defendant moved for the appointment of new counsel because he felt that he and his attorney were "not seeing eye to eye." (Doc. 22; Doc. 65 at 10:13-11:7). In an extraordinary break from tradition, this Court acquiesced, removing the appointed federal public defender and appointing Paul Laufman, Esq. as Defendant's new counsel on October 10, 2014. (Doc. 23). Although Mr. Laufman immediately undertook plea negotiations on Defendant's behalf, in April 2015, Mr. Laufman informed the Court that a resolution may not be possible and stated that, at Defendant's behest, he intends to file pretrial motions. (Min. Entry & Not. Order, 4/10/2015).

On August 31, 2015, Defendant filed a motion to proceed *pro se*. (Doc. 54). This Court held a *Faretta* hearing and, having engaged Defendant in a thorough colloquy, granted Defendant's motion and appointed Mr. Laufman as stand-by counsel at Defendant's request. (Min. Entry & Not. Order, 9/14/2015; Docs. 58, 67). However, even months before the Court granted Defendant's motion to proceed *pro se*, this case was effectively stalled by Defendant's frivolous, inconsistent, and ceaseless *pro se*

4

filings.  **(Docs. 25, 26, 27, 28, 29, 37, 38, 39, 40, 41, 46, 47[2], 49, 52, 53, 54, 59, 60, 61, 62, 63, 64, 68, 69, 70, 71, 72, 74, 75, 76, 78, 80, 81, 83, 85, 86, 88, 89, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 116, 117, 118, 125, 129, 130, 132, 133, 134, 135, 140, 151, 152).**  Often, no sooner had the Court set Defendant's motion for briefing or a hearing than Defendant would senselessly bombard the Court with countless additional motions, which, at times, actually sought contradictory relief.[3]

On February 5, 2016, Defendant appeared before this Court and pled guilty to Count 6 of the Indictment pursuant to a Rule 11(c)(1)(C) plea agreement.[4]  (Doc. 120). The agreed upon sentence, as set forth in the binding plea agreement, called for the imposition of a term of thirty-six months of imprisonment, followed by three years of supervised release, the first twelve months of which Defendant was to serve on home

---

[2] Ironically, Doc. 47 is a Notice of Withdrawal of Motions and Demand for Speedy Trial, filed by defense counsel at Defendant's request.  (Doc. 47).  In short, Defendant chose to assert his right to a speedy trial and, to that end, demanded the withdrawal of his counsel's coherent and timely filed pretrial motions, only to turn around and himself file substantively the same motions, which he then re-filed repeatedly after they were denied or stricken.  *Compare, e.g.,* defense counsel's motion to suppress physical evidence and statements (withdrawn by Defendant) (Docs. 31 and 32), *with,* Defendant's *pro se* motions to suppress (Docs. 39, 59, 63, 68, 72, 74, 75, 78, *etc.*).

[3] *See, e.g.*, Defendant's notice of *withdrawal* of pretrial discovery and suppression motions and *demand* for speedy trial, filed July 20, 2015 (Doc. 47); Defendant's motion to proceed as "co-counsel" to allow him to *file* pretrial discovery motions, filed August 7, 2015 (Doc. 49); Defendant's motion to *continue* trial date, filed August 31, 2015 (Doc. 53); and Defendant's motion to proceed *pro se* (*i.e.*, not as "co-counsel"), filed August 31, 2015 (Doc. 54).

[4] Count 6 charged one count of wire fraud in violation of 18 U.S.C. § 1343.  (Doc. 3).  The offense of wire fraud is a Class C Felony, carrying a potential maximum of twenty years imprisonment, a $250,000 fine (or two times the gross gain or loss), and up to three years of supervised release.  18 U.S.C. § 1343; (Doc. 120 at 2).

detention.  (*Id*. at 4, ¶ 11).  Further, the Rule 11(c)(1)(C) plea agreement included terms

relating to restitution, and stated that:

> [T]he parties also agree that the defendant, as part of his
> sentence, will pay $2,800 in restitution to First Financial
> Bank, in connection with the conduct outlined in Count 29 of
> the Indictment.  The parties agree that no determination has
> been made as to the amount of restitution owed, if any,
> related to the tax fraud scheme and this determination shall be
> made by the Court at the time of sentencing.

(Doc. 120 at 4, ¶ 11) (emphasis added).

Moreover, the parties included a separate paragraph in the plea agreement

dedicated solely to the issue of restitution, wherein Defendant once again agreed to pay

$2,800 to First Financial Bank on a monthly payment plan to be determined by the Court.

(*Id*. at 5, ¶ 13).  Further, the restitution section reiterates that:

> The parties, however, have not reached an agreement as to the
> restitution amount owed in this case, if any, as it relates to the
> tax fraud scheme.  Such determination will be left to the
> Court at the time of sentencing, where each party reserves the
> right to present evidence and make arguments as to an
> appropriate amount.

(*Id*. at 5-6, ¶ 13) (emphasis added).

The plea agreement also included a Statement of Facts, which Defendant

acknowledged as accurate, signed, and, ultimately, reaffirmed in open court.  (Doc. 120,

Ex. A).  The Statement of Facts, in relevant part, states as follows:

> On or about February 16, 2012, within the Southern District
> of Ohio, [Defendant], **for the purpose of executing and
> attempting to execute the scheme to defraud described in
> the Indictment**, electronically filed from his residence, by
> means of wire communication, a false 2011 federal tax return

6

for "D.J.," which claimed a refund of $957 that the Internal Revenue Service (IRS) ultimately issued.

(*Id.*) (emphasis added).[5]

The plea agreement also included an appellate waiver, stating that "[t]he defendant waives his right to appeal the sentence imposed, including the rights conferred by 18 U.S.C. § 3742(a), except with respect to the restitution order imposed upon him at sentencing, if any, for the tax fraud scheme." (Doc. 120 at 3, ¶ 7) (emphasis added).

The Court, having engaged Defendant in a thorough Rule 11 colloquy, determined that Defendant's plea of guilty was knowingly, voluntarily, and intelligently made. (Doc. 121). Accordingly, the Court accepted Defendant's plea of guilty, and found Defendant guilty on Count 6 of the Indictment, based upon the facts agreed to and admitted by Defendant himself in the duly executed Statement of Facts. (*Id.*) However, the Court deferred acceptance of the Rule 11(c)(1)(C) plea agreement pending review of the presentence investigation report ("PSR"). (*Id.*) Sentencing was scheduled for May 23, 2016. (Doc. 123).

On February 10, 2016, less than a week after his plea hearing, Defendant filed a motion seeking to withdraw his plea. (Doc. 125). On February 15, 2016, Defendant mailed a request for a transcript of the plea hearing stating, "I went to court February 5, 2016 that was the change of plea hearing. I will need the transcripts from that court date February 5, 2016 because on February 10, 2016 I filed a motion to withdraw my guilty

---

[5] The Statement of Facts includes only one other paragraph, which relates solely to the check-kiting scheme. (Doc. 120, Ex. A).

plea.  The court transcripts from my court date February 5, 2016 are necessary."[6]

(Emphasis added).  On February 17, 2016, the Court set an extended briefing schedule to ensure all parties had received the transcript and that Defendant had sufficient time to file a reply to the Government's anticipated response in opposition to his motion to withdraw his plea.  (Not. Order, 2/17/2016).  Further, as Defendant was seeking to withdraw his guilty plea, the Court ordered that the presentence investigation be suspended until after disposition of the motion.  (Doc. 128).

On March 2, 2016, three weeks after moving to withdraw his plea, Defendant moved to withdraw the motion to withdraw his plea and asked to proceed with sentencing.  (Doc. 129).  Yet, on March 16, 2016, having just filed a motion to withdraw his motion to withdraw his plea, Defendant moved once again for a copy of his change of plea transcript, despite the fact that he had initially requested the transcript in order to prepare to withdraw his plea.  (Doc. 130).  Thus, the Court assumed that Defendant had once again changed his mind and may be preparing to move to withdraw his motion to withdraw his motion to withdraw his plea.  True to form, however, on April 1, 2016, Defendant filed yet another motion, this time demanding that the Court vacate its order staying the presentence investigation, thereby implying that Defendant was now eager to proceed to sentencing (*i.e.*, that he no longer intended to withdraw his guilty plea).  (Doc. 132).

---

[6] The transcript request was processed by the Clerk of Court's Office and promptly fulfilled by the Court Reporter, but was not filed on the docket.  The Court did, however, retain the letter in Defendant's file.

In light of the patent inconsistencies in Defendant's *pro se* filings, this Court entered a notation order on April 11, 2016, which stated as follows:

> This case is before the Court on Defendant's motion to resume the presentence investigation. (Doc. 132). The Court declines to resume the presentence investigation until the Court has had the opportunity to determine the validity of Defendant's plea, which determination cannot be made until the [previously established] 5/18/2016 hearing [regarding Defendant's plea motions]. Accordingly, Defendant's motion to resume the presentence investigation (Doc. 132) is DENIED at this time. IT IS SO ORDERED.

(Not. Order, 4/11/2016).

Within a week, Defendant filed a motion "to terminate the motion to withdraw his guilty plea." (Doc. 134). In his motion, Defendant boldly blames the Court for delaying his case and wasting his time by setting an "inappropriate" hearing. (*Id.*) Accordingly, he demanded that the May 18, 2016 hearing and the motion to withdraw his plea "be terminated immediately" and the presentence investigation "resume immediately." (*Id.*) Needless to say, Defendant's motion was denied.

The Court held a hearing on Defendant's plea motions on May 18, 2016, which, in effect, became a second plea hearing. (Doc. 138). Initially Defendant appeared *pro se*, with stand-by counsel, Paul Laufman, in attendance. (Doc. 153 at 3:2-10). However, early in the proceedings, the Court inquired and Defendant expressly stated his desire to have counsel represent him throughout the hearing that day, as well as during the subsequent sentencing hearing. (*Id.* at 5:18-7:5). Accordingly, at Defendant's request, the Court re-appointed Mr. Laufman as counsel for Defendant. (*Id.*) During the hearing, the Court once again engaged Defendant in an exceedingly thorough Rule 11 colloquy.

(Doc. 138). Defendant unequivocally affirmed his guilty plea and re-executed the plea agreement. (*Id.*; Doc. 137). Accordingly, the Court ordered that the presentence investigation resume and, in order to accommodate Defendant's wishes, this Court imposed upon the probation officer to complete the investigation and prepare the PSR on an extremely expedited basis.[7] (Doc. 138). The Court scheduled Defendant's sentencing hearing for June 13, 2016 and ordered the parties to fully brief the issue of restitution in advance. (*Id.*)

As scheduled, on June 13, 2016, the Court held the sentencing hearing, during which the Court accepted the Rule 11(c)(1)(C) plea agreement and, accordingly, sentenced Defendant to thirty-six months imprisonment with credit for time served, three years of supervised release with the first twelve months on home detention, no fine, and the mandatory $100 special assessment. (Doc. 156). Moreover, having heard arguments from both parties, having thoroughly reviewed the briefing, and having presided over this case—which had been ongoing and <u>extremely</u> involved for over two years—this Judge found that the Government had met its burden as to restitution and, accordingly, ordered Defendant to pay restitution in the amount of $227,380 to the IRS for the fraudulent tax scheme, in addition to the $2,800 to First Financial Bank agreed upon in the Rule 11(c)(1)(C) plea agreement. (*Id.*) Neither party raised any new substantive or procedural objections in response to the Court's *Bostic* inquiry.[8]

---

[7] The Court once again expresses its gratitude to U.S. Probation Officer Michelle Conerty for her professionalism, hard-work, and absolute willingness to accommodate the time constraints imposed upon her by the Court.

[8] *See United States v. Bostic*, 371 F.3d 865, 870-73 (6th Cir. 2004).

The Court docketed its Judgment on June 23, 2016 and stated therein that the Court intended to issue a written order memorializing the restitution determination. (Doc. 156 at 5). Defendant, through counsel, filed a notice of appeal on June 26, 2016. (Doc. 158).

## II. STANDARD OF REVIEW

The Mandatory Victim Restitution Act (the "MVRA") provides that, "when sentencing a defendant convicted of an [applicable] offense … the court <u>shall</u> order, in addition to … any other penalty authorized by law, that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1).[9] Restitution under the MVRA is mandatory and must be imposed without regard for the defendant's ability to pay. 18 U.S.C. § 3664(f)(1)(A).

The Government bears the burden of demonstrating the victims' loss amounts and "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). Further, "[w]hether restitution is mandatory or permissive, the government must establish that actual losses to a victim were directly and proximately caused by the offense of conviction." *United*

---

[9] The MVRA applies to offenses as described under 18 U.S.C. § 3663A(c)(1). Relevant here, the MVRA applies to "an offense against property under [Title 18] … including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). An offense "against property" includes monetary harm. *E.g.*, *United States v. McDaniel*, 398 F.3d 540, 554 (6th Cir. 2005) (holding that the MVRA applied to bank fraud, as it was an offense "against property … committed by fraud or deceit"); *United States v. Luis*, 765 F.3d 1061, 1065-66 (9th Cir. 2014) (re-affirming that offense causing "pecuniary loss" was "against property" under MVRA); *United States v. Turner*, 718 F.3d 226, 236 (3d Cir. 2013) (holding that conspiring to defraud the IRS was offense "against property" under MVRA because taxes owed are the "property" of the IRS). Further, the Sixth Circuit has repeatedly upheld application of the MVRA to wire fraud specifically. *See*, *e.g.*, *United States v. Winans,* 748 F.3d 268, 272 (6th Cir. 2014).

11

*States v. Sawyer*, -- F.3d ---, No. 15-5181, 2016 WL 3125986, at *6 (6th Cir. June 3, 2016). The Court does not need to make specific factual findings in calculating restitution; however, the information relied upon "must have sufficient indicia of reliability to support its probable accuracy." *Id.*

### III. ANALYSIS

In his opposition to the Government's restitution motion, as well as his sentencing memorandum, Defendant raises several objections to the restitution amount sought by the Government. (Docs. 149, 150-1). Specifically, Defendant argues that: (1) the MVRA only mandates payment of restitution related to the offense of conviction, not relevant conduct; (2) the Government is attempting to reach beyond the statute of limitations to collect restitution; (3) the Government failed to prove the amount of restitution by a preponderance of the evidence; and (4) the Government's restitution figure is inflated. (Docs. 149, 150-1).

### A. Restitution is Not Limited to the Count of Conviction in this Case

Defendant argues that restitution under the MVRA is limited solely to the count of conviction and, therefore, he cannot be held liable for any amount beyond the $957 loss charged in Count 6, to which he pled guilty. (Doc. 149-1). However, Defendant's argument misstates the applicable law.

"In calculating restitution, 'the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order.'" *United States v. Kratt*, 579 F.3d 558, 565 (6th Cir. 2009) (quoting *Hughey v. United States*, 495 U.S. 411, 420 (1990)). However, after the Supreme Court's decision in *Hughey* limited restitution to

the loss specifically caused by the offense of conviction, Congress amended the restitution statute to expand its applicability by defining a wider range of victims.  *See United States v. Davis*, 170 F.3d 617, 627 (6th Cir. 1999) (citations omitted).

A 'victim' under the MVRA is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, **in the case of an offense that involves as an element a scheme**, conspiracy, or pattern of criminal activity, **any person directly harmed by the defendant's criminal conduct in the course of the scheme**, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2) (emphasis added).

Here, Defendant pled to one count of wire fraud, in violation of 18 U.S.C. § 1343. The elements of wire fraud are: "(1) **a scheme or artifice to defraud**; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property."  *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (internal quotation marks omitted) (emphasis added).

As a "scheme" is an element of the wire fraud offense, restitution here is not limited to victims harmed by the offense of conviction, but rather, the Court must look to "any person harmed by the defendant's criminal conduct in the course of the scheme." 18 U.S.C. § 3663A(a)(2); *United States v. Winans*, 748 F.3d 268, 272 (6th Cir. 2014) (affirming order of restitution to 612 victims even though the defendant pled to one count of wire fraud with two specified victims only, as the MVRA's exception applied to wire fraud offenses because a "scheme" is an element of 18 U.S.C. § 1343).

13

Further, when a defendant is "convicted pursuant to a guilty plea rather than by a jury, the Court should look to the plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the 'offense of conviction' for purposes of restitution." *United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009). In this case, Defendant has admitted in the plea agreement, on the record, and in the PSR that he was indeed involved in a scheme to defraud as described in the Indictment, and that the conduct underlying Count 6 was part and in furtherance of that scheme.

Therefore, restitution here is not limited to Defendant's count of conviction, and the Court's restitution determination encompassing the full loss amount attributable to the 'scheme to defraud' is appropriate.

### B. The Government is Not Reaching Beyond the Statute of Limitations

Defendant argues that the restitution amount sought by the Government is an over-reach, as it encompasses loss outside the statute of limitations. (Doc. 149 at 1). Defendant concedes that the statute of limitations for wire fraud is five years; however, perplexingly states that "[Defendant] was indicted on May 7, 2014. Thus restitution for any return filed before that time should be disallowed." (*Id.*)

The Sixth Circuit has not squarely addressed the issue of whether and when the statute of limitations affects restitution. However, other circuits—specifically, the Seventh, Eighth, Tenth, and Eleventh—have found that the statute of limitations does <u>not</u> limit restitution as long as the loss arises from the scheme underlying the offense of

conviction.[10]  While this Court is persuaded of the same, it appears unnecessary to delve

into such an analysis, as the statute of limitations has not run on Defendant's offense.

Pursuant to 18 U.S.C. § 3282(a):

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless _the indictment_ is found or the information is instituted within five years next after such offense shall have been committed.

(Emphasis added).  Thus, the Indictment effectively tolls the statute of limitations.

Here, regardless of the fact that each offense was charged as an individual count,

the conduct was all part of one ongoing scheme to defraud.[11]  Indeed, the individual tax

returns aside, Defendant's actual conduct involved: (1) obtaining and keeping identifying

information of individuals so that he could file tax returns on their behalf, and without

---

[10] _United States v. Brown_, 665 F.3d 1239, 1253 (11th Cir. 2011) ("restitution may properly be awarded for a victim's losses caused by 'the defendant's conduct in the course of the scheme … where such losses were caused by conduct outside the statute of limitations") (emphasis in original); _United States v. Williams_, 356 F. App'x 167, 170 (10th Cir. 2009) (affirming district court's ruling that because the defendant was convicted of wire fraud, which offense includes a 'scheme' as an element, "the defendant [must] pay restitution for all losses the victims suffered as a direct result of the scheme, even if the losses were caused by conduct outside the statute of limitations"); _United States v. Bach_, 172 F.3d 520, 522 (7th Cir. 1999) (affirming full restitution amount relating to the entirety of a mail fraud scheme even though only two mailings were made within five-year statute of limitation period and charged in the indictment, and both mailings were intended to cover-up the fraud rather than elicit more money from victims, because "the scheme was both to defraud and to retain investors' money and [] the mailings charged in the indictment were indeed in furtherance of that scheme"); _United States v. Welsand_, 23 F.3d 205, 207 (8th Cir. 1994) (holding that, although the wire fraud counts in the indictment were limited to those offenses within the five-year statute of limitations, the defendant's "interrelated acts [for over ten years] constituted the 'conduct underlying the offenses of conviction' and established the outer limits of the restitution order").

[11] "A scheme to defraud is 'any plan or course of action by which someone intends to deprive another … of money or property by means of false or fraudulent pretenses, representations, or promises.'"  _United States v. Faulkenberry_, 614 F.3d 573, 581 (6th Cir. 2010) (quoting _Daniel_, 329 F.3d at 485.

their consent, year after year; (2) tracking the fraudulent returns and checking the status of the refunds over time; and (3) maintaining fraudulent bank accounts for the purpose of receiving the refunds issued as a result of the scheme.

In other words, Defendant's method, motive, victims, pattern, and goal remained entirely consistent throughout the course of his conduct. For these reasons, the Court considers Defendant's offense conduct to be part of one scheme and, therefore, the statute of limitations did not start running until the entire scheme ended (here, after the last fraudulent act occurred). *See, e.g.*, *United States v. Andrews*, 803 F.3d 823, 825-26 (6th Cir. 2015) ("even if the jury had decided that the [wire fraud] scheme ended when Andrews received the last loan, the *entire* scheme faces no statute-of-limitations problem because the last loan occurred within five years of the indictment") (emphasis in original). As the Government's spreadsheet indicates, here, the last fraudulent tax return was filed on May 13, 2013 and, therefore, the statute of limitations period did not begin to run until at least that date—less than one year before the Indictment was returned and well within the limitation period. (Doc. 154).

Moreover, even if the Court were to set aside the date of the 'last fraudulent act' in the tax fraud scheme, and, instead, use the date of the act underlying the count of conviction (*i.e.*, Count 6)—which conduct Defendant admitted in the Statement of Facts he committed in furtherance of, "the scheme to defraud described in the Indictment"—the statute of limitations period would not start until February 16, 2012 (*i.e.*, the date on which, according to Defendant's admitted facts, the conduct underlying Count 6 occurred). In other words, regardless of whether the five-year period is computed using

16

the date of the last fraudulent act or the date of the act charged in Defendant's count of conviction, the statute of limitations had not run on May 7, 2014 when Defendant was indicted, nor on June 13, 2016 when Defendant was sentenced. Accordingly, the Court does not find that the restitution amount is limited by the statute of limitations.

Further, even if the Court were to construe the law and facts entirely in Defendant's favor, his argument would still fail. Here, the Indictment was filed on May 7, 2014. (Doc. 3). Therefore, without question, the five-year statute of limitation period reaches back to at least May 7, 2009. For the sake of argument, if the Court were to construe each individual fraudulent tax return as its own separate offense, which offense is completed immediately upon filing of the return (*i.e.*, without regard for the subsequent period of time when Defendant tracked the returns or ultimately received the refunds), <u>the five-year statute of limitation period would bar only those returns filed *before* May 7, 2009</u>. Turning to the Government's restitution spreadsheet (Doc. 154), which this Court relied upon for the restitution amount computation, the earliest fraudulent tax return listed was filed on <u>June 10, 2009</u> (*i.e.*, over a month after the statute of limitations cut-off date, as established above).

As Defendant was indicted before the statute of limitations had run on any of the fraudulently filed tax returns for which the Government sought restitution (Doc. 154), the refunds issued as a result are properly included in the restitution amount.

## C. The Government Did Not Fail to Meet Its Burden

Defendant alleges that the Government failed to meet its burden to prove the restitution amount by a preponderance of the evidence and, further, generally objects to

17

the "overbroad method in which the Government attempted to hold him responsible for all intended loss ...."  (Doc. 150 at 2).  More specifically, Defendant contends that the Government's only evidence in this case is essentially one IP address, which only ties the fraud to a computer in a certain location, but not to Defendant specifically.  (Doc. 149 at 2).  Defendant claims that the fraudulent scheme was actually perpetrated by a number of people who the Government simply chose not to indict.  (*Id.*)  Further, Defendant alleges that the Government's restitution spreadsheet is erroneous, as it also includes legitimately filed tax returns.  (*Id.*)  Finally, Defendant claims that the Government could not prove that any of the identity theft victims were actually harmed.  (Doc. 150-1).

**First**, Defendant's claim that the Government is largely relying upon one IP address and various banking records to tie him to the fraudulent scheme grossly understates the Government's evidence of Defendant's involvement.  Indeed, the fraudulent tax returns are linked to Defendant in countless different ways.[12]

For example, the execution of the search warrant uncovered hundreds of stolen identities and, for some, the associated bank cards, located <u>in the portion of the home</u>

---

[12] The Government's restitution motion thoroughly sets forth the <u>numerous</u> different ways that Defendant is linked to the fraudulent tax returns.  (Doc. 142 at 5-9; Doc. 144, Ex. B; Doc. 147 at 7-17; Docs. 154 and 155).  To provide just one example:

> [A] 2011 tax return was filed in the name of "D.C." on August 30, 2012 from the IP address associated with Defendant's residence. IP address records for [Defendant's email address] YGIMMSE@YAHOO.COM also show a log-in on that same day from the same IP address.  Additionally, this tax return listed Defendant's business address for the taxpayer address and D.C.'s PII [personal identification information] was found in Defendant's portion of the residence.

(*Id.* at 8).

where Defendant resided. (Doc. 147 at 2). Further, the traceable IP addresses all either link to Defendant's home or his business. (Doc. 155). Defendant's home and business addresses were also used consistently as the return address on submitted tax returns. (*Id*.) Also, there were emails in the names of the identity theft victims found in Defendant's email accounts, which accounts were often accessed using the same computer and on the same day that the fraudulent tax returns were electronically filed. (*Id*.) Defendant used his own cell phone to track the status of the refunds from the fraudulent tax returns. (Doc. 147 at 2-3). Defendant even directed that the refunds be deposited into his own bank account, or bank accounts that he controlled and had opened using the same fraudulent means, tracing to the same physical locations, and using the same email and physical addresses that Defendant used to file the fraudulent tax returns. (*Id*.)

In short, through the use and reuse of the names and social security numbers of individuals over several years, the links to Defendant grow more numerous and exponentially stronger, while rendering it almost inconceivable for anyone else to be responsible. It defies logic to say that another individual (whom Defendant never identified for the Court and whom even federal agents were unable track down) could have been engaging in this scheme by storing hundreds of names and social security numbers in Defendant's home after writing them down in Defendant's handwriting, then using Defendant's home computer to file the fraudulent tax returns and also travelling to Defendant's place of work to do the same, tracking refunds using Defendant's cell phone, corresponding in the names of the identity theft victims from Defendant's email address,

and finally depositing the refunds into Defendant's account (or accounts that Defendant controlled or could access).

**Second**, Defendant's claim that there are a number of unindicted co-conspirators culpable for this offense (none of whom Defendant has identified to the Court) is unpersuasive and, frankly, irrelevant. As the Government explains in its sentencing memorandum, IRS agents thoroughly investigated all of Defendant's ambiguous claims that other individuals were also filing false tax returns out of Defendant's residence at the same time, but ultimately determined that no one else was involved in the fraudulent scheme. (Doc. 9-10).

Moreover, even assuming *arguendo* that Defendant was merely one of several co-conspirators, this Court would still hold him joint and severally liable for the full amount of the restitution. *Sawyer*, 2016 WL 3125986, at *7 ("Section 3664(h) specifically empowers district courts to make individual defendants liable for all of the losses caused by multi-defendant crimes … [including] in the conspiracy context"). Thus, Defendant's argument that he is not the only participant in the offense is irrelevant in this Court's view.

**Third**, Defendant's allegation that the Government's spreadsheet is "riddled with inaccuracies," and includes countless legitimately filed tax returns, is entirely without basis. (Doc. 149 at 2). Indeed, Defendant was only able to identify <u>one</u> tax return that he claimed was erroneously listed, and although the Government had evidence to cast significant doubt on the claim, the Government, in an abundance of caution, removed that one tax return from the spreadsheet <u>prior to the sentencing hearing</u>. (Doc. 147 at 14).

20

Regardless, Defendant repeatedly points to this <u>single</u> return as evidence that the Government's entire spreadsheet is so deeply tainted that it cannot be relied upon. The Court disagrees. Common sense dictates that if Defendant had actually prepared legitimate tax returns for anyone on the final list (Doc. 154), he would have been able to identify that person. He could not do so.

**Fourth**, Defendant's assertion that the Government could not prove that any of the identity theft victims were actually harmed is baseless and irrelevant. In fact, the Government interviewed numerous witnesses who were prepared to testify at trial that they had never given Defendant permission to file tax returns on their behalf, or that they had allowed Defendant to file their returns on a specific occasion, but had <u>not</u> consented to Defendant filing their tax returns from 2008-2012, to fabricate information, or to retain the refunds. (Doc. 147 at 3, 8-9). In response, Defendant merely states that those individuals are lying. However, Defendant's response is not a substantive rebuttal, nor does it undermine the validity of the Government's investigative work. Moreover, the fact that numerous tax returns were prepared for **<u>incarcerated and deceased</u>** individuals undermines Defendant's credibility in that regard and, further, belies the assertion that Defendant was a legitimate tax preparer.

### D. The Government's Restitution Amount is Not Inflated

Defendant argues that the $227,380 restitution figure includes money that he never received, as the tax refunds were diverted after being issued by the IRS and applied to the victims' pre-existing federal debts, such as student loans. (Doc. 149 at 3). Defendant asserts that because he did not profit from those refunds, and because the federal

government retained the money (albeit in the hands of a different department), that it should be excluded from the final restitution amount. (*Id*.) The Court disagrees.

Defendant submitted fraudulent tax returns to the IRS and claimed refunds to which he was not entitled. As a result, the IRS issued the refunds. In other words, <u>the IRS lost the money</u>. Whether it went to Defendant or the Department of Education or was lost in the mail is of no consequence. The fact of the matter is that the money never would have left the hands of the IRS if not for Defendant's fraudulent scheme. Accordingly, Defendant is liable for the loss to the IRS, regardless of whether he received the refunds or not.[13]

## IV. CONCLUSION

Based upon the foregoing, as articulated at the time of sentencing, the Court found by a preponderance of the evidence that restitution in the amount of $227,380 accurately reflects the loss directly and proximately caused by the fraudulent tax scheme underlying Defendant's count of conviction. Accordingly, the Government's restitution motion (Doc. 142) was **GRANTED** and Defendant **SHALL** pay to the IRS restitution of $227,380, as well as $2,800 to First Financial Bank pursuant to the plea agreement.

**IT IS SO ORDERED.**

Date: 7/5/2016                                              *s/Timothy S. Black*
                                                            Timothy S. Black
                                                            United States District Judge

---

[13] *See United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006) (affirming actual loss computation where district court ruled that even where the defendant had billed Medicare for legitimate services provided to qualified Medicare recipients, the defendant "missed the point" in arguing that Medicare had not suffered a loss, because the "evidence showed that Medicare would not have paid [] but for the [underlying] fraud").